FELIX T. MURPHY

v.

FRANZ J. KASTNER.

1. A liquidated and undisputed overdue debt is not discharged by a simple payment of a part of what is due, though accompanied and witnessed by a receipt in full not under seal.

2. Written authority from a creditor to an agent to "*accept, receive and receipt for*" the amount "*due him*" from his debtor, and to do all things requisite and necessary to be done in the premises, does not authorize the agent to give away a portion of the debt, or to accept a part as payment in full.

3. Where it becomes necessary in executing a contract made in the United States to ascertain the equivalent in United States currency of a sum of money expressed in British currency, the true and only mode, where none is expressed in the contract, is to count the pound sterling as equivalent to $4.86.6½, as fixed by section 3565 of the Federal Revised Statutes. The so-called "current rate of exchange" between New York and London does not govern.

4. Defendant authorized the complainant to sell his brewery to an English corporation for a consideration named, to be paid part in cash and part in debentures, and to give complainant for his services all the purchase price over $720,000, and to take his (seller's) portion part in cash and part in debentures. In pursuance of complainant's efforts the contract was made, in complainant's absence, between the agent of the English corporation and the defendant for the sale of the property for $790,000 which was carried out and the consideration paid to defendant, part in cash and part in sterling debentures payable fifty years from date in London. The contract between the defendant and the English agent provided that the sterling bonds should be counted at $4.88¼ to the pound sterling, instead of the actual equivalent of $4.86.6½, and they were so counted in order to make up the sum of $790,000. Defendant consented to this through ignorance. Afterwards defendant made up a statement to complainant's agents showing the amount received by him, in which statement he counted the debentures at $4.84 to the pound, that being the rate of exchange of the day, and the statement so made up showed that defendant had received less than $790,000, by about £800, and he paid the agent partly in cash and partly in debentures a sum less by £800 than would amount to $70,000, for which the agent gave a receipt in full.—*Held*, this was a clear mistake, and that in the settlement between complainant and defendant the latter must be charged with the bonds at $4.88¼, and must deliver to the complainant additional bonds sufficient to make up the difference.

Heard on bill, answer and proofs.

*Messrs. Whitehead & Condit* and *Mr. Richard V. Lindabury*, for the complainant.

*Mr. Samuel H. Pennington, Jr.*, and *Mr. Carl Lentz*, for the defendant.

PITNEY, V. C.

This is a suit to recover a balance alleged to be due from the defendant to the complainant for services rendered.  The bill sets out a settlement between the complainant, acting by agents, and the defendant, and a receipt in full or release given by the agents to defendant upon payment to them by defendant of a sum which was supposed by the agents at the time to be the amount actually due, but which, in point of fact, was considerably less than such amount, and that the misapprehension on the part of complainant's agents was due to false statements and misrepresentations made to them by defendant at the time of the settlement.

The bill prays to be relieved from the effects of the release and for payment.  The answer denies the mistake and misrepresentation, and alleges that the settlement was fairly and accurately made upon a proper basis agreed upon by the parties at the time of the settlement.  No objection is taken in the answer to the jurisdiction of the court, nor, indeed, at any time until after the evidence was closed.

The facts are as follows: In the spring of 1889 (and for many years prior thereto) the defendant was the owner of a brewery in Newark, and complainant was trying to make sale of it to English capitalists under the written authority of the defendant, and was stopping in London.  A prospectus of the business was in complainant's hands, dated in March.  On April 10th, 1889, defendant executed a power of attorney to complainant, superseding a previous one, and authorizing him to make the sale to a corporation to be formed, upon the following terms: £175,000 sterling in cash, or £85,000 sterling in cash and £90,000 sterling, payable, " Thirty thousand pounds in debenture bonds, thirty thousand pounds in preferred shares and Thirty thousand pounds

in the ordinary shares of the aforesaid corporation." By a note of even date—April 10th, 1889—addressed to complainant, defendant promised complainant that if he accomplished the sale, he should have for his compensation all the consideration received by the defendant over and above $720,000, United States currency, to be paid to the defendant as follows: $400,000 in cash and $320,000 in debentures, preferred shares and ordinary shares of the corporation in equal proportions.

If the sale had been completed on these terms, it would have resulted as follows, counting the pound sterling at the usual equivalent of $4.86.7 (the equivalent established by the federal statute is $4.86.65 (*Rev. Stat. U. S.* § *3565*), which is based upon a comparison of the quantity of fine gold contained in the standard coins of the two countries):

| Power of attorney to sell at £175,000 | | $851,725 |
|---|---|---|
| To be paid as follows: | | |
| Cash | £85,000 | $413,695 |
| Deben | £30,000 | 146,010 |
| Pref. shares | £30,000 | 146,010 |
| Com. shares | £30,000 | 146,010 |
| | £175,000 | $851,725 |

| Compensation to broker to be all over | | $720,000 |
|---|---|---|
| To be paid the seller as follows: | | |
| Cash | $400,000 | |
| Deben | 106,666 67 | £21,916 $\frac{80}{100}$ |
| Pref. stock | 106,666 67 | £21,916 $\frac{80}{100}$ |
| Com. stock | 106,666 67 | £21,916 $\frac{80}{100}$ |
| | $720,000 00 | £65,748 $\frac{90}{100}$ |

If this scheme had been carried out, the seller would have got:

| Cash | $400,000 |
|---|---|
| Stock and debentures, £65,748 $\frac{90}{100}$ | 320,000 |
| | $720,000 |

Murphy v. Kastner.

The broker would have got:

| | | |
|---|---|---|
| Cash..... ................................ | $413,695 | |
| Less.. ....... ............................. | 400,000 | |
| | | $13,695 |
| Debentures and shares............ ...... | £90,000 | |
| Less.. .......... ............................ | £65,748 $\frac{90}{100}$ | |
| | £24,251 $\frac{10}{100}$ | $118,030 00 |
| | | $131,725 00 |

Complainant's negotiations resulted in the visit by Mr. Russell H. Monro, the representative of certain London capitalists, to New York in June, 1889, where he was brought into immediate contact with the defendant. Complainant was still in London, but was represented in New York by Messrs. Sullivan & Tone, a firm of financial agents doing business there. On June 17th defendant and Monro entered into a written contract, by which defendant agreed to sell his brewery and plant to Monro at the price of

"$790,000, of which amount, the equivalent of £85,000 *at the current rate of exchange obtaining on the 28th day of June, 1889,* shall be paid and accepted in first mortgage five per cent. debentures at par, of a total issue of £90,000, executed by an English or American Company to be hereafter formed, which said issue of debentures shall be secured by a first mortgage upon all the said real property and fixtures on said premises, and shall carry interest from the 1st day of August, 1889."

At the same time the rate of exchange was agreed upon verbally between Monro and the defendant at $4.88¼ to the pound. Mr. Sullivan, one of complainant's agents, was present at the office of Seward, DaCosta & Guthrie, counsel for the London capitalists, when this agreement was signed, but took little or no part in it, and I am satisfied that he knew nothing of the fixing of the rate of exchange at $4.88¼. The details of the affair were arranged between Mr. Monro, aided by the counsel first mentioned, and the defendant, aided by his own counsel. The reduction in price from $851,725 to $790,000 was made by complainant's consent.

This contract was carried out. The cash was paid to defendant in installments, the last one early in October, and the conveyance was delivered on the 9th of that month.

The consideration was paid thus:

| | |
|---|---|
| Cash | $374,987 50 |
| Bonds, £85,000, at $4.88¼ | 415,012 50 |
| | $790,000 00 |

The bonds, however, were not prepared and executed until November, and bore date November 1st, with interest coupons from August 1st, 1889, as required by the contract.

There never was any dispute but that this contract was the result of complainant's work in London, and that he was entitled to his compensation under defendant's letter of April 10th.

After the execution of the contract of June 17th there was an understanding had between Sullivan & Tone, representing the complainant, and the defendant that complainant's commissions should be paid half in cash and half in bonds—the amount to be retained by defendant remaining the same, viz., $720,000—which would make complainant's compensation $90,000 instead of $131,725.10, which it would have amounted to if the sale had been carried through at the price originally named.

In pursuance of this understanding, defendant, on the 28th of October, paid to Sullivan & Tone, for the complainant, $35,000 in cash, taking the following receipt prepared by defendant's counsel:

"$35,000. NEWARK, N. J. October 28th 1889.
"Received from Franz J. Kastner of Newark, Essex County, New Jersey, thirty five thousand ($35,000) dollars on account of commissions due or to become due for services rendered or to be rendered in the sale of the business and brewery of said Franz J. Kastner, he, said Franz J. Kastner to realize seven hundred and twenty thousand ($720,000) dollars net.
"FELIX J. MURPHY, per B. W. Tone, attorney.
"B. W. TONE,
"JNO. A. SULLIVAN."

This payment was a confirmation as well of the original written agreement of April 10th to pay to complainant all the considera-

tion received by defendant over $720,000 as also of the subsequent verbal agreement that complainant should have one-half, or $35,000 in cash. The use of the words, "Franz J. Kastner to realize $720,000 net," is a mere repetition, in substance, of language found in the letter of April 10th, which provided for complainant's compensation—

"and said sum of Seven Hundred and Twenty Thousand Dollars so to be paid, to be the net price so as aforesaid and no charges for expenses, commissions, outlays or other charges whatsoever to be paid by me or on my behalf."

The case shows that the contract actually made by the defendant and carried out was a more advantageous one for him than the one authorized to be made by the power of attorney of April 10th, for while he got in ready cash less by some $60,000 than he stipulated for in the agreement for compensation of April 10th, he got for the balance of the purchase money five per cent. bonds secured by first mortgage on his brewery instead of unsecured debentures and shares of stock as provided for in the power of attorney.

The £85,000 sterling bonds were delivered to defendant late in November, and it was in the payment to complainant's agents of the balance due him out of those bonds that the alleged mistake was made. The settlement was made December 3d, 1889, between Messrs. Sullivan and Tone, acting for complainant, who was in England, and the defendant and his counsel.

Before stating what the parties did in that behalf I stop to inquire just what amount of the bonds the complainant was entitled to under his contract. Now it seems to me perfectly plain that if nothing had been said in the contract of June 17th, 1889, about "*current rate of exchange*" the settlement between all the parties—between Monro and the defendant and between the complainant and the defendant—must have been at $4.86.65 (four dollars eighty-six cents and six and a half mills) to the pound. That is the equivalent well known in mercantile circles—the well known par of exchange between the metallic currencies of the two countries. That basis is the only rule for rendering the "money of account" of the one country into that of the other.

Murphy v. Kastner.

It is so declared by the federal statute of March 3d, 1873 (*Rev. § 3565*):

"In all payments by or to the treasury, whether made here or in foreign countries, where it becomes necessary to compute the value of the sovereign or pound sterling, it shall be deemed equivalent to four dollars eighty-six cents and six and one-half mills, and the same rule shall be applied in appraising merchandise imported where the value is, by the invoice, in sovereigns or pounds sterling, *and in the construction of contracts payable in sovereigns or pounds sterling;* and this valuation shall be the par of exchange between Great Britain and the United States, and all contracts made after the first day of January, 1874, based on an assumed par of exchange with Great Britain of fifty-four pence, or four dollars forty-four and four-ninths cents to the sovereign or pound sterling shall be null and void."

By "*par of exchange*" is here meant the precise equivalent of value of the gold coins of the two nations—the relative melting value of each. (See note.)

The daily rates of exchange between New York and London fluctuate on each side of this actual par of exchange in obedience to the law of supply and demand, depending each day upon whether there is more money due from residents of this country

NOTE.—The act of April 3d, 1792, established the weight of the gold eagle at 270 grains 916⅔ fine, which is equal to 246$\frac{263}{1000}$ grains of fine gold; and the acts of June 28th, 1834, and January 18th, 1837, combined, made the eagle weigh 258 grains 900 fine, which is equal to 232.2 grains of fine gold, and diminished the value of the eagle under the act of 1792 as follows: After 1834–37 the eagle was worth $10; before 1834–37 the eagle was worth $10.65.8. Prior, then, to 1834–37 the English sovereign of the present day would have been worth $4.54, or about nine and one-half cents more than the par of $4.44.4 coinage value; but the par of exchange was fixed at $4.44.4 by act of July 31st, 1789, before any gold or silver had been coined, and was based on the value of the Mexican silver dollar, which was followed by the American silver dollar of equal value, which history tells us was then worth more, in the world's market, by three per cent. than one-tenth of an eagle, and was, therefore, exported as fast as coined. This difference of three per cent. added to the difference in the gold coin of six and one-half per cent. made up the nine and one-half—nine and three-fourths difference. After the new standard of 1834–37 was established the use of the old nominal par of exchange of $4.44.4 was continued, but the actual par was the difference between $4.44.4 and $4.86.6½, or about 109¾. The act of congress, section 3565, was aimed at this inconvenient expression of value. See *Linder. Leg. Tend.* 15–30, 60; *History of American Currency, by Sumner, 103, 112.*

to residents of Great Britain, payable there, than there is due from residents of Great Britain to residents of this country and payable here and *vice versa*. If there is a greater demand in New York for money to be paid in London than there is in London for money to be paid in New York, then exchange will favor London, and the New York debtor will be obliged to pay a premium for his bill of exchange with which to pay his London creditor and *vice versa*. This premium or variation one way or the other from the actual par of exchange is fixed daily, so far as it can be said to be at all fixed, by a few bankers who deal in foreign exchange, but in all actual transactions a margin is allowed for the bankers' profits. They do not buy and sell at the same rate. They daily post a buying and selling rate, and, after all, it is a matter of contract in each case, and the price paid often varies from the posted rates. There is also a difference in price between bankers' bills and what are called commercial or documentary bills, which are sold by the merchants to the bankers and which command a less price than bankers' bills. So that, in point of fact, there can be, in law, no such thing as an actual " current rate of exchange " for want of any recognized authority to fix it. The same fluctuations occur between distant points in the same country—*e. g.*, New York and San Francisco.

So much to make it quite clear that the daily rates of exchange between New York and London relate wholly to present actual settlements between these cities. The fact that the cost in New York on a particular day of a draft on London is more than the actual par of exchange is no guide as to what it will be worth a year or ten years later. It may then be worth more or it may be worth less than par. Hence the present state of the foreign exchange market forms no element in ascertaining the present value in New York of an obligation payable in pounds sterling in London at a future day—a day beyond the range of the ordinary mercantile transactions with which the foreign bankers deal. In fact, the actual selling value of these debentures was not anywhere involved in the transaction. Such selling value or price would depend upon a variety of elements, such as the rate of interest they bore, the value of the property mortgaged to secure

them, the probability that the interest would be paid promptly, the length of time they had to run, and other elements which affect the market value of the ordinary negotiable securities of the day. It is plain that the parties did not undertake to ascertain such actual selling value, but were occupied with the question of the convertible value of the two national currencies, and for this purpose it is quite clear that the actual melting value of their respective metallic currencies was the only standard. That was accurately ascertained and fixed by the act of congress above cited, and in the absence of a rate fixed by the contract that act would control.

It was admitted by the parties that the £85,000 sterling mortgage debentures delivered to the defendant were payable in London in 1939. This being so, Mr. Monro obtained a decided advantage over the defendant or his counsel in inducing him to take these sterling bonds at the rate of exchange of the day, $4.88¼, instead of the actual par of $4.86.65. The difference amounted to no less than $1,350 against the defendant. It is, however, to be remarked that in settling the terms of the contract of June 17th, 1889, either party had the right, as against the other, to impose such terms, favorable to himself, as he could induce the other party to accept, and the price at which the sterling bonds should be counted was, of course, at that time wholly a matter of contract to be determined between the parties.

But the affair between the complainant and the defendant was in a different condition when it arrived at the point of counting out to the complainant his compensation under his contract. His right to that was not a matter of negotiation or bargain, but was fixed by a written contract which, it must be observed, did not fix any particular exchange value on the sterling bonds mentioned in it. The absence in the contract of expression on that subject left it subject to the operation of the federal statute.

The complainant was entitled, by his contract, to all the purchase price received by the defendant over and above the sum of $720,000, whether received in cash, or in promises to pay in the future, and whether those promises were payable in English money in England or in the United States currency in the United

Murphy *v.* Kastner.

States; and as these debentures were made payable at a future day the present rate of exchange had no bearing on their value in United States currency. That could be ascertained only by the use of the actual par of exchange ascertained and fixed by the federal statute, except so far as the defendant had voluntarily, as he did, put on them a greater value. Having done that, it seems to me that it did not lie in his mouth to say that they were worth less than he had taken them at, although by reason of adopting a false measure, for the use of which complainant was in no wise responsible, he had taken them at a greater price than their actual value, and much more was he not entitled to apply to them the same false and uncertain measure in order to reduce their value below what it actually was?

And it must be observed in this connection that it does not appear that Mr. Monro put any pressure on the defendant in order to induce him to accept the bonds at $4.88¼. For aught that appears he would have consented to put them in at their actual par value of $4.86.65 if defendant or his counsel had possessed the knowledge necessary to suggest it. But, in point of fact, it would seem that as well Messrs. Sullivan & Tone, as the defendant and his counsel, were in entire ignorance of the proper mode of rendering the debentures from sterling currency into federal currency. But neither complainant nor Messrs. Sullivan & Tone meddled in this part of the affair, and defendant is solely responsible for the loss.

For these reasons, it seems to me that when Messrs. Sullivan & Tone, on the 3d of December, 1889, called on the defendant for the remainder of complainant's compensation, the ascertaining the amount due complainant was a mere matter of computation. There was no room for bargaining or negotiation; there was nothing in dispute between them, unless it was as to whether, in ascertaining the number of sterling bonds required, with the cash received, to make the defendant's net price up to $720,000, the bonds were to be counted at $4.86.65, or at $4.88¼ to the pound sterling; and this, I think, should, for the reasons just stated, have been decided in favor of the $4.88¼ basis.

The computation, then, should have been made thus:

Murphy *v.* Kastner.

| | | |
|---|---|---|
| Cash received by the defendant......................................... | $374,987 | 50 |
| Less paid to complainant..................................................... | 35,000 | 00 |
| Leaving in defendant's hands, cash.................................. | $339,987 | 50 |
| Total net price to be received by him............................... | 720,000 | 00 |
| Leaving to be paid to defendant in bonds........................ | 380,012 | 50 |

The amount of bonds, at $4.88¼, necessary to make up this sum of $380,012.50, was £77,831$^{54}$/$_{100}$, which, deducted from £85,000 in defendant's hands, leaves £7,168$^{46}$/$_{100}$ due to the complainant in bonds.

Now, what actually occurred between complainant's agents and defendant and his counsel was this: defendant's counsel made a computation which has been preserved and exhibited in evidence, thus:

| | | |
|---|---|---|
| "Amount of purchase price received, cash........................ | $374,987 | 50 |
| Bonds of 85,000 pounds at 4$\frac{84}{100}$...................................... | 411,400 | 00 |
| | $786,387 | 50 |
| Amount to be realized by Mr. Kastner... ......................... | 720,000 | 00 |
| Amount of commission.................................................... | 66,387 | 50 |
| Cash paid by Mr. Kastner................................................ | 35,000 | 00 |
| Balance due in bonds...................................................... | 31,387 | 50 |
| Less 4 months' interest at 5 per cent. on $31,387.50............... | 523 | 12 |
| | $30,864 | 38" |

And on this basis defendant gave to complainant's agents £6,400 in bonds—a little more than was due him according to the defendant's computation, but £768 less than he was entitled to upon the principle that I have adopted. The bonds were for £200 each.

The parties are not in accord as to how and why $4.84 to the pound was adopted as the basis of settlement. Messrs. Sullivan & Tone swear that defendant's counsel asserted that the bonds were taken from the English company at that rate, and, therefore, that complainant must consent to the same rate in fixing their value in making up the defendant's $720,000, and this misstatement is the misrepresentation set out in the bill. On the

other hand, defendant and his counsel both deny this, and swear that the settlement was made on the basis of the value of foreign exchange on that day, which the parties ascertained by reference to a price list of foreign coin in which sovereigns were quoted at $4.84.

Now, it is common knowledge that the buying and selling price of foreign gold coins in New York vary from each other more than do those of foreign exchange. The dealers in foreign coins demand and receive a larger margin for profit and for loss due to abrasion and cost of shipment. It is only the unworn sovereign whose coinage value in our mint is equal to $4.86.65, and, in order to entitle the holder to recoinage at the United States mint at that rate, he must present a certain number of such unworn sovereigns for that purpose. The holder of worn sovereigns must ship them to England in order to pass them at par, and hence they are subject to a discount equal to the expense and risk of shipment. Their price does not coincide with the price of foreign exchange, and but for the admission by counsel of complainant that foreign exchange was worth only $4.84 on the day in question—December 3d, 1889—I should have held that the coin list in question, or any competent proof of the selling price of sovereigns, furnished no proof of the price of foreign exchange; but assuming, as I must upon that admission, that the rate of foreign exchange that day was $4.84, the question of fact remains whether the defendant and his counsel did or did not represent to complainant's agents that the bonds were taken from the English company at $4.84. The evidence of defendant and his counsel is very clear and distinct, and, I may add, consistent, in support of their theory of the transaction, much more so than that of the two agents on the other side. But there is a circumstance in the case which defendant was unable to explain satisfactorily, although invited to do so, and which, I think, turns the scales against him. The statement made up by defendant's counsel, above set forth, shows that, counting the bonds at $4.84 to the pound, defendant received only $786,387.50 instead of $790,000, the contract price agreed upon, and complainant's agents thereupon started the question how it happened that

---

---

defendant got no more than that amount when his contract called for $790,000, and it was suggested by some one (by whom is a matter of dispute) that there were some bonds still due to defendant in the hands of Seward, DaCosta & Guthrie which might account for the deficiency. Defendant and his counsel swear that this suggestion was made by Messrs. Sullivan & Tone, and those gentlemen on the other side swear that it came from the defendant. Be that as it may, the result was that, in addition to the £6,400 of bonds actually delivered to the complainant, defendant gave to his agent an order in these words:

"NEWARK, N. J., December 3, 1889.

"*To Messrs. Seward, DaCosta & Guthrie:*

"GENTLEMEN—Please deliver to John A. Sullivan any undelivered debentures that may yet be due me under my contract with Russell H. Monro.

"FRANZ J. KASTNER."

And the agents thereupon signed a receipt, as follows:

"NEWARK, N. J., December 3rd, 1889.

"Received of Franz J. Kastner the sum of Sixty-six thousand three hundred and eighty-seven dollars and fifty ($66,387.50), *and order for undelivered bonds, if any*, in full for all claims, expenses, fees, charges and commissions on account of the sale of his brewery to Russell H. Monro, of London, England, and all other claims of whatsoever nature which, against the said Franz J. Kastner, we now have or may have to the date of these presents.

"FELIX T. MURPHY, per B. W. Tone, attorney.

"B. W. TONE.

"JNO. A. SULLIVAN."

Now, this order for the undelivered bonds was based upon the notion that defendant had not received all that was due him, and this again was based upon the notion that he had accepted the bonds at a less rate than $4.88¼; for the £85,000, counted at $4.88¼, added to $374,987.50 cash, make just $790,000, as above shown. And so I am unable to see any excuse or reason whatever for making this order and framing the receipt as it was framed, unless it had been then and there stated that the bonds had been taken at a less rate than $4.88¼, and so I think the weight of the evidence is that it was then and there stated by defendant or his counsel that the bonds had been taken from Mr.

Monro at $4.84, and, further, that the suggestion that there were additional bonds in the hands of Seward, DaCosta & Guthrie came from the defendant; for, in point of fact, there were additional bonds in their hands, and that fact was known, as far as appears, only to the defendant. The whole issue was £90,000, £85,000 of which was paid to the defendant as part of the purchase price of his property, and the other £5,000 were to be negotiated for cash. Of these Mr. Monro agreed to take £2,000, and the defendant agreed, subsequently to the signing of the contract, to take £3,000 and to pay the cash for them. The good faith of Messrs. Sullivan & Tone is shown by the fact that they went immediately to Seward, DaCosta & Guthrie with the order in question, and there, as they say, learned for the first the fact that the bonds had been taken by defendant at $4.88¼, and that the £3,000 of bonds in their hands could only be had on paying cash for them; whereupon they immediately demanded of the defendant that he should correct what they claimed to be an error.

But I deem the determination of the question whether the defendant made any representations to the complainant's agents on the occasion in question a matter of little importance, since I think that the complainant's rights were fixed by previous contract, and were not a matter of present negotiation or bargaining. Mr. Tone was acting under a power of attorney, produced by the defendant, executed by the complainant, and dated the 18th of September, 1889, while the complainant was temporarily in New York city, and which authorized Mr. Tone, as follows:

"*To accept, receive and receipt for*, in my name, place and stead, *the commissions due me from Franz J. Kastner* of Newark, New Jersey, *on the sale of his brewery and business in England,* giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever *requisite and necessary to be done in and about the premises,* as fully, to all intents and purposes, as I might or could do if personally present with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or his substitute shall lawfully do or cause to be done by virtue hereof."

Mr. Tone had no authority under this written power to give away any portion of what was due to the complainant. His power was simply one of computation and receipt of a sum fixed by the previous contract. In accepting the amount of bonds which he did he fell into a clear mistake, for which, to say the least, the defendant was quite as much responsible as the complainant's agents. The parties adopted a false standard for the computation of the equivalent in value in United States currency of the £85,000 debentures. The present current rate of exchange on London was not the true test of their value in that connection, and its adoption was a mistake which worked an injury to the complainant. The defendant paid nothing—gave no equivalent—for the loss to the complainant resulting therefrom. He has not in anywise changed his position so as to render it inequitable or unjust as against him to correct the mistake of which he had immediate notice. No injury will be done the defendant by compelling him to deliver to the complainant the additional amount of bonds which he was bound by his contract to deliver. The correction of such mistakes is the peculiar province of this court.

Another erroneous element in the settlement was the charging the complainant with interest on these bonds. How men of intelligence and ordinary business capacity could have submitted to such a demand it is difficult for me to conceive. The defendant's counsel was lavish of compliments to the shrewdness and acuteness of complainant's agents. So far from being able to coincide with the counsel in that respect, I think they showed themselves to be exceptionably stupid and quite unable to take care of themselves or the interests of their principal. They seem to have trusted defendant's counsel with childlike simplicity. Look at it for a moment. The complainant was to have all the defendant received over $720,000. The theory of the defendant and his counsel was that the settlement was made on the basis of the value of the consideration received by defendant for his property to be computed as of the day of the settlement, December 3d, 1889. It was on that basis, and that only, that the defendant justifies resort to the rate of exchange on London on that day.

Now, it seems too plain for argument that, upon that basis, consistency required him to charge himself with interest up to that day on the money he had previously received, and also to add to the face value of the sterling bonds the interest which had accrued on them.   In no other mode could he arrive at an accurate ascertainment of the value on that day of the consideration received. From the total of the consideration thus arrived at defendant was entitled to deduct his $720,000, and the surplus belonged to the complainant.   It thus appears that the introduction of the element of interest should have resulted in materially reducing the amount to be retained by defendant and materially increasing the amount to be paid to complainant.   But this mode of ascertaining the amount due to each was wholly erroneous.

Defendant was entitled to $720,000 out of the consideration, and all beyond that belonged to complainant from its inception, and the ownership carried with it the earnings.

The charge for interest was without the shadow of support.

With regard to the jurisdiction of this court.   As before observed, no point was made on that until after the evidence was closed, but I think that whenever taken it is not tenable, for not only does the element of mistake give jurisdiction, but the complainant is entitled to the bonds themselves, and is not obliged to take money in place of them, or damages for their non-delivery, since they may be worth to him a great deal more than par, and he can only get them in this court.   He was entitled on the day of the settlement, according to the statement above made up, to bonds amounting to £7,168$46/100$; that is, £31$54/100$ short of £7,200, which is the nearest approach to the actual balance which the size of the bonds (£200 each) will admit of; that is, he was entitled to thirty-six bonds of £200 each upon paying to the defendant £31$54/100$ at $4.88¼.   Of this he has had £6,400, leaving £800, or four bonds at £200 each, with the earnings, still due to him.

The bill was filed upon the supposition that the receipt and release given by complainant's agents was under seal.   Such is not the fact.   If it had been, I think that the element of mis-

take, which entered into its execution, would have entitled the complainant to relief against it in this court, but not being under seal it is unavailable as a defence to an action at law. The principle governing a case of this kind may be stated thus: a liquidated and undisputed overdue debt is not discharged by a simple payment of a part of what is clearly due, though accompanied and witnessed by a receipt in full not under seal. Such a payment does not amount to accord and satisfaction. *Cumber* v. *Wane, 1 S. L. C. A.* \*439 *and notes; Line and Nelson* v. *Nelson & Smalley, 9 Vr. 358.*

Here the amount due complainant was undisputed, and it was payable in certain bonds in defendant's possession. The defendant paid the demand by delivering a smaller portion of the bonds than was due complainant, and took his receipt in full not under seal. He gave complainant nothing *different* from what he had agreed to give him and was by law bound to give him, but he gave him *less* of it than he was so bound to give. This brings the case directly within that portion of the rule, in *Cumber* v. *Wane,* which has never been disturbed and still remains as the expression of what is right and just between man and man. The order for undelivered bonds was not only a fraud, but was a mere nullity, and so cannot be considered as something of value not included in the contract, which, being delivered with the partial payment, will be held a full satisfaction. But admitting that the complainant could have maintained an action at law, this court still has jurisdiction founded upon the mistake which the right at law does not take away.

I will advise a decree that the defendant do deliver to the complainant four of the debenture bonds in question, of £200 each, and that he account to him for all the interest which he has received upon them, and that in such accounting the defendant be credited with the sum of £31$^{54}$/$_{100}$ at the rate of $4.88$\frac{1}{4}$ to the pound, and that the defendant pay the complainant's costs.